In the Matter of Lloyd Dell COLIN and Delores Maxine Colin, Debtors.

COMMERCE BANK OF KANSAS CITY, N.A., Movant,

v.

Lloyd Dell COLIN and Delores Maxine Colin, Respondents.

Bankruptcy No. 84–00499–SJ–11.

United States Bankruptcy Court,
W.D. Missouri,
St. Joseph Division.

Nov. 8, 1984.

See also, Bkrtcy., 44 B.R. 704.

Bruce E. Strauss, Shockley, Reid & Koger, Kansas City, Mo., for movant.

Jeffrey P. White, Chicago, Ill., Harold Kyser, Butler, Mo., for respondents.

ORDER DISMISSING CHAPTER 11 PROCEEDINGS WITHOUT PREJUDICE AND SUBJECT TO REINSTATEMENT ON RETENTION OF LOCAL COUNSEL AND DEMONSTRATION OF OTHER FACTS, AWARDING ATTORNEYS FOR DEBTORS $2359 IN ATTORNEYS' FEES AND $865 REIMBURSEMENT OF EXPENSES, AND DIRECTING RETURN OF REMAINDER OF RETAINER FEE

DENNIS J. STEWART, Bankruptcy Judge.

The within chapter 11 proceedings were filed on February 16, 1984. The debtors

filed a proposed plan of reorganization and disclosure statement on October 1, 1984. This was done after the moving creditor Commerce Bank of Kansas City, N.A., moved to dismiss the chapter 11 proceedings for delay prejudicial to creditors within the meaning of section 1112(b)(2) of the Bankruptcy Code.

The court subsequently entered its orders setting hearings for November 2, 1984, on the pending motion to dismiss and on the sufficiency of the disclosure statement under the standards set forth in section 1125 of the Bankruptcy Code.[1]

Pursuant to those orders, the hearings were convened on November 2, 1984, whereupon the Sur Gro Finance Company appeared by counsel, James H. Thompson, Jr., Esquire; the Bank of Coffey appeared by Jere Lloyd, Esquire; the Farmers Home Administration appeared by Larry Coleman, Esquire, Assistant United States Attorney; and the movant Commerce Bank of Kansas City, N.A., appeared by Bruce Strauss, Esquire. The debtors appeared personally, but they did not appear also by local counsel, as is required by the local rules of bankruptcy procedure. In this particular case, the court granted foreign counsel leave to appear *pro hac vice* in this case only upon the representation made by the debtors in their application of March 2, 1984, that "Attorney Harold A. Kysar of Butler, Missouri, will act as local co-counsel with Mr. White." Nevertheless, in the hearings which have to date taken place before the court, Mr. Kysar has not appeared, nor has Mr. White, but rather other foreign counsel has appeared, who has neither been admitted *pro hac vice* nor otherwise qualifies as counsel to practice before the court in this district. As will be detailed below, the failure of the debtors to be actively represented by their local co-

counsel has worked great prejudice both to themselves and their creditors.

After the filing of the proposed disclosure statement, the court entered its order on October 4, 1984, directing that a hearing be held on November 2, 1984, in St. Joseph, Missouri, "on the sufficiency of the debtors' proposed disclosure statement." According to the local practice and the terms of the order of October 4, 1984, which included a provision for creditors' filing written objections to the sufficiency of the proposed disclosure statement *prior* to the hearing on sufficiency, it was clear that counsel for the debtors were to circulate their proposed disclosure statement to creditors prior to the hearing. But no circulation was made. And this was so even though counsel for the Farmers Home Administration telephonically advised counsel of the necessity for distribution of the proposed disclosure statement.

At the outset of the hearing of November 2, 1984, on the sufficiency of the disclosure statement, the creditors then present stated that they had not been able to review the disclosure statement, which had not previously been distributed to them, in order to propound any objections to its sufficiency. Counsel then present for the debtors moved to continue the hearing on sufficiency of the disclosure statement, a motion which, if granted, would significantly delay the progress of these chapter 11 proceedings toward confirmation.[2]

Pursuant to the prior notice issued, the court then proceeded with the hearing on the motion of the Commerce Bank of Kansas City, N.A., to dismiss these chapter 11 proceedings on the ground that there had been delay prejudicial to creditors. In the hearing which was then held, the following material facts were demonstrated by the admissible and probative evidence taken:

---

**1.** The orders setting the hearing on the motion for dismissal were timely issued so as to give the advance notice to all creditors required by the governing rules of bankruptcy procedure.

**2.** The rules of bankruptcy procedure require that the court grant 25 days notice for a hearing

on the sufficiency of the disclosure statement and another 25 days notice for the hearing on confirmation. If the hearing on sufficiency of the disclosure statement should develop serious deficiencies, then additional time may be required.

In their schedules which were filed in conjunction with their petition for relief under title 11 of the United States Code, the debtors state that they have property valued at $250,099.00. Their principal asset is a 160-acre farm which is subject to a claimed security interest by the Farmers Home Administration greatly exceeding its value. The debtors schedule a total indebtedness of $777,868.49. In excess of eight months have passed since the inception of these title 11 proceedings, during which no amounts have been paid to the creditors. But, as will be further detailed below, the debtors paid a retainer of $10,000 to the foreign counsel retained by them (which they state they borrowed from their son) and they are currently incuring fees charged them by the Alms Capital Corporation at the rate of $100 per hour for preparing and submitting an application for a $375,000 loan from the Farmers Home Administration. The debtor Lloyd Dell Colin has considerable experience as a rancher and a farmer. He purchased the farm which he currently owns, subject to the claimed mortgage interests, in 1957, and has raised cattle, hogs, and corn on it. According to his testimony, he has enjoyed some success in farming until the recent past. In addition to the $375,000 loan application which is to be submitted to the Farmers Home Administration, the debtors are currently negotiating a lease of 600 cattle from the Schulz Cattle Company of Amarillo, Texas, which would provide for a 5-year lease at $5 per head with the debtors to be able to keep, at the end of the 5-year period, certain of the cattle for their own benefit. According to the testimony of the debtor Lloyd Dell Colin, this lease may materialize on or about December 1, 1984. Between now and then, he is to show the potential lessor the pastures and wheat seed which he has available for the operations which will be necessary under the lease. Additionally, Mr. Colin states that he commenced work as a salesman some three weeks ago for a feed company located in Quincy, Illinois; that he is paid on the basis of a commission for his sales; and

that he feels that he can "work it up to $10–12,000 per year." His present testimony concerning the levels of his livestock show it to have diminished considerably since the filing of the petition, without any concomitant payment to the lienholder, the Farmers Home Administration.[3] Additionally, a wheat crop was harvested by the debtors during the pendency of these chapter 11 proceedings. According to the testimony of Lloyd Dell Colin, they have sold $2600 worth of the harvested wheat. He states that those proceeds are currently segregated in an account which is jointly payable to him and the Farmers Home Administration. Some 2,000 additional bushels of wheat which was harvested by the debtors is currently stored by them. Mr. Colin also admits that, during the pendency of these chapter 11 proceedings, he used some 4,000 pounds of silage in which the Sur Gro Finance Company claims a security interest to feed cattle which "would have died" without receiving the sustenance thus provided.

According to the testimony of Richard Vulgamott, the county supervisor for the Farmers Home Administration in Bethany, Missouri, the debtors previously applied for a loan from the Farmers Home Administration in May 1983; the application was rejected; and an appeal from the rejection was denied. It was his testimony that the pending loan application—if in fact it has been filed—would take some time to process, at least 60 days, and that it would then be "very unlikely," in view of the prior rejection, that the debtors would obtain the loan which they seek to obtain from the Farmers Home Administration. The debtors presented a witness by the name of John Hayes, who stated that he was an account executive for the Alms Capital Corporation and that the application for the FHA loan had been prepared by Alms Capital Corporation and sent to an entity entitled Securities Acceptance Corporation, "our loan brokers," for submission to the FHA or to the First Federal Savings

---

**3.** Cf. the considerations set out on pages 714    and 715 of the text of this memorandum, *infra.*

Bank of Indiana. According to his testimony, both the Alms Capital Corporation and Securities Acceptance is charging the debtors for these services, but he is not privy to any information concerning the magnitude of charges which have so far been built up.

The operating reports which have been filed by the debtors during the course of these chapter 11 proceedings purport to show no appreciable income during the eight-month course of the proceedings. The proposed disclosure statement of the debtors shows huge net losses during three of the four years next preceding the filing of the petition for relief and a moderate net loss for the year before the filing. Nevertheless, the proposed disclosure statement posits more than sufficient income in the years 1985 and 1986 to service the current debt and make payments under the proposed plan of reorganization. Admittedly, however, the only connection between the hopeful postulations of the projections and the reality of the present absence of income is the $375,000 loan which is hoped to be obtained, directly or indirectly, from the Farmers Home Administration and with which purchases of livestock will be made which will produce the greater future income. From the evidence which has been detailed above, however, it appears "very unlikely," in the words of the Farmers Home Administration official who testified in the hearing, that such a loan will ever be obtained.

Further, by the time any such loan is obtained, it appears that the costs of administration which are necessary to be undertaken to make the application will be exceedingly great. To date, there is no evidence as to the number of hours which are being spent on the application by the Alms Capital Corporation and the Securities Acceptance Corporation. But, as noted above, Mr. Hayes has testified that the former expects to be paid $100 per hour for an untold number of hours and the latter also expects to be paid an uncertain amount. The authorization of the court to retain the former entity for certain projects was not meant to constitute a *carte blanche* for building up enormous costs

before the court is given an opportunity to pass on their necessity and compensability. Rather, it was meant, as the law intends, that only the actual and necessary expenses be compensated at rates which are reasonable.

■ The same principles apply to the attorney's fees of the attorneys for the debtors. The governing law obligates the court to see that the awards are within reason and that they are in accordance with local standards respecting hourly rates and represent compensation for actual legal services which are necessary to the estate in bankruptcy. See section 330 et seq. of the Bankruptcy Code. The provisions of section 331 of the same code, which provide for the awarding of interim compensation quarterly to attorneys in bankruptcy proceedings, makes it clear that counsel are to be circumspect respecting exacting their fees in advance; that, in most imaginable instances, they should not collect awards of fees until they have been actually earned and awarded by order of the court. The current local practice in the United States Bankruptcy Court for the Western District of Missouri requires that the attorney receive an order of the court approving the award before actually exacting or taking the fees in hand. In this case, however, the attorneys for the debtors took an extraordinarily large retainer in the sum of $10,000. According to the testimony of the debtor Lloyd Dell Colin in the hearing of November 2, 1984, the attorneys are holding this fund in "trust" and removing monies from it as they consider that such monies have been "earned" by their endeavors in these chapter 11 proceedings. He stated that he believed that the amount which had been removed to date was the sum of $3,000. This practice is neither warranted nor condoned by the governing statutes nor the local practice in respect of awards of attorney's fees. In most imaginable instances, it would pre-empt the bankruptcy court of its rightful power and duty to determine the reasonableness and legality of attorneys' fees before they are awarded.

In its prior orders, acting on the objection of the Commerce Bank of Kansas City, N.A., this court has required attorneys for the debtor to produce their detailed statement in support of the attorney's fees which they claim in connection with these proceedings. In summary, the debtors' attorneys, as of the date of September 14, 1984, seek an award of $5,824.12. This includes 27.95 hours by Jeffrey P. White at $100 per hour; 16.55 hours by Beth Benjamin at $80.00 per hour; and 10.5 hours by Donald Johnson at $80.00 per hour. The court may review the attorneys' fees from the detailed statement and make its conclusions respecting the reasonableness of the award which is sought. See, e.g., *Lindy Bros. Bldrs., Inc., of Phila. v. American R & S San. Corp.*, 487 F.2d 161, 169 (3d Cir.1973), to the following effect:

> "Courts have noted that expert testimony is not necessary to establish the value of a lawyer's services and have, on that ground, sanctioned the award of attorneys' fees on the basis of affidavits without a hearing ... A judge is presumed knowledgeable as to the fees charged by attorneys in general and as to the quality of legal work presented to him by particular attorneys; these presumptions obviate the need for expert testimony such as might establish the value of services rendered by debtors or engineers ... (except) where the facts to be weighed in light of the judge's expertise are disputed."

In respect of the process of determining the correct amount of an award of attorney's fees, the basic initial question is the reasonable hourly rate to be charged. "After determining, as above, the services performed by the attorneys (from their affidavit or detailed statement), the ... court must attempt to value those services ... A logical beginning in valuing an attorney's services is to fix a reasonable hourly rate for his time—taking account of the attorney's legal reputation and status (partner, associate)." *Id.* at 167. In so doing, the court may take judicial notice of the average hourly rate for attorneys in the locality in bankruptcy proceedings. That average hourly rate, for an attorney of average experience and ability, is $70 per hour. The applicant attorneys in the case at bar, who are foreign counsel, have not included with their detailed statement any summary or resume of their qualifications so that the court can establish a suitable beginning point at anything but the average of $70 per hour. Additionally, "the value of attorneys' services should reflect two other factors—the contingent nature of success and the quality of the attorney's work ... (T)he second factor is 'evidenced by the work observed, the complexity of the issues and the recovery obtained ...' *Lindy Bros., Builders, Inc., v. American Radiator & Standard San. Corp.*, 540 F.2d 102, 112 (3d Cir.1976). In reviewing the services which are attributed to Jeffrey P. White, the court must observe that it consists of no court appearances and has primarily been office discussions with the debtors and other attorneys in the office and the review of work which has been carried out by other attorneys. Despite the fact that, as noted above, it was only Mr. White who was admitted to practice before this court *pro hac vice* in this case, Mr. White has never appeared before this court, either in the hearing which was held on the issue of nondischargeability of the indebtedness to the Commerce Bank of Kansas City, N.A., or in the hearing held on the motion to dismiss. In respect of the detailed statement submitted regarding his services, there is nothing in the rather cryptic descriptions afforded which would warrant the court in granting anything more than the average hourly rate. Further, in considering the "contingency" or "risk" factor and the results achieved by means of the services rendered, the court finds reason for discounting the hourly rate. According to the facts found above, and the conclusions of law applied below, it seems that it should have been obvious from the outset that the bankruptcy court could ultimately do no more than dismiss these chapter 11 proceedings. When the debt is more than three times the value of

the property and when reorganization can admittedly and obviously result if a $375,-000 loan can be obtained directly or indirectly from a government entity which opposes reorganization and which has previously rejected an application of the debtors for credit, the lack of viability of chapter 11 proceedings is all too painfully apparent. And it is granting applicant counsel the benefit of a doubt and assuming that the transparent futility of chapter 11 proceedings only recently became known to them that the court finds that Mr. White's services should be valued at $60 per hour.

■ With respect to the services of other counsel for which compensation is claimed, the court would be fully justified in denying any compensation at all. They were never appointed as counsel for the debtors and were never authorized to perform legal services compensable from the bankruptcy estate. Only Mr. White was so appointed, and then only as co-counsel to Mr. Kysar, neither of whom have actually ever appeared before the court. It is not so much as evidenced to the court that the other applicants even have status or credentials as lawyers or paralegals. But, again, in order to grant the applicants the benefit of a doubt, the court will proceed with a determination of the value of the services rendered. In view of the absence of evidence respecting qualifications, the value of the services must necessarily be diminished. And, again, the court must take note of the futility of these proceedings as another paramount factor. In also considering the quality and type of services rendered, it is concluded that these services cannot be compensated at a rate exceeding $40 per hour.

Accordingly, the total award grantable to those who have claimed fees as counsel for the debtors is $2359.00 in addition to the reimbursement of $865.12 in expenses.

■ The governing law will not permit this court to entertain these chapter 11 proceedings for a further period of time. According to the facts which have been demonstrated, the process of reorganization cannot be effected for an indefinite period of time while the loan application continues to be prepared and filed by the Alms Corporation (at great cost, it must be noted, to the debtors and creditors). Even then, the loan application is unlikely to be granted. In the meantime, the demands of the secured creditors for "adequate protection" will go unanswered, contrary to the governing bankruptcy law. In a recent case which bears material points of similarity to this one, *Matter of Cassavaugh*, 44 B.R. 726 (Bkrtcy.W.D.Mo.1984), the following pertinent observations, applicable also to this case, were made:

"(T)hese chapter 11 proceedings have now pended for some eight months during which the debtors have made little or no payment to secured creditors nor offered them any other form of 'adequate protection' such as is required by sections 361–363 of the Bankruptcy Code. Under the law which applies under these sections, even an undersecured creditor is not adequately protected simply by the value of its collateral, as counsel has repeatedly suggested in these proceedings. Rather, the undersecured creditor is entitled to adequate protection of the use value of its collateral. *In re American Mariner Industries, Inc.*, 734 F.2d 426, 435 (9th Cir.1984) ('We hold that Crocker National Bank is entitled to compensation for the delay in enforcing its rights during the interim between the petition and confirmation of the plan.') This protection must continue even after confirmation of the plan. And the rights of oversecured creditors are, if anything, greater. But, in the case at bar, there is admittedly no offer or potential for such adequate protection ...

"All this seems to be admitted by counsel for the debtors, who nevertheless urges the court and creditors to infuse into the bankruptcy process a form of relief which can be meaningful to a farm debtor who has no significant current income to offer to creditors and whose future

potential is wholly speculative and uncertain. Under such circumstances, if the debtors, as is admittedly the case at bar, cannot obtain the consent of at least one class of creditors, the only possibility, it seems, would be an indefinite moratorium on payments to secured creditors. But such relief in bankruptcy has previously been held by the Supreme Court of the United States to be an unconstitutional taking of property rights without due process of law in *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). "It is true that, in a later decision, the Supreme Court held that a temporary moratorium on payments might be in consonance with constitutional principles. *Wright v. Vinton Branch of the Mountain Trust Bank of Roanoke*, 300 U.S. 440, 57 S.Ct. 556, 81 S.Ct. 736 (1937). But, as noted above, the current bankruptcy law, with its demands for pre-confirmation adequate protection, does not travel the full distance which the *Wright* decision, *supra*, makes constitutional. .... (T)he bankruptcy court has commenced to see a parade of farm debtors—hard workers, good citizens, once proud and once productive—who are caught in this catastrophic transformation of the rural economy and who are suffering the insufferable—the loss of home and a lifetime vocation in one fell swoop. But the scourging of the countryside seems to fall upon the doorstep of the bankruptcy court at a time in its history when it is less able than in almost any prior epoch to deal with it (by reason of) a cloud affecting (its powers) which far removes (it) from the ability to transcend statutory limitations in favor of the full width of equity which may be allowed by constitutional principles. As a private citizen, a judge might wish that more could be done. But, as a judge, he must always and everywhere be mindful of the limitations which the law imposes upon him. 'The court cannot be wiser than the law.' *Matter of Anderson*, 12 B.R. 483, 491 (Bkrtcy.W.D.Mo.1981)."

In this case, as in that one, dismissal is the court's only recourse. But, since this court cannot say that, with the assistance of attentive local counsel, the debtors might not show the court other facts which would augur more favorably for success in rehabilitation, the court will make the dismissal without prejudice to a refiling if and when competent local counsel is retained as lead counsel and *other facts than have been shown in this case can be shown to the court which favor reorganization.*

Because of the dismissal, however, and the effect of new section 109(f) on the refiling of bankruptcy cases generally, the court does not find it necessary to rule on the pending motion of the Sur Gro Finance Company for relief from the automatic stay. That relief is automatically granted upon dismissal of these proceedings. According to the force and effect of section 109(f), it will remain in effect even in the face of a refiling. The questions concerning perfection of Sur Gro's security interest are mooted by the absence of avoiding powers which are reaved from the debtors with the dismissal. The questions concerning validity can be litigated *inter partes* in other appropriate forums.

Accordingly, for the foregoing reasons, it is hereby

ORDERED that counsel for the debtors are awarded the sum of $2359 in attorneys' fees and $865 in reimbursement of expenses and they are directed forthwith to return the remaining portion of the $10,000 retainer, plus any interest earned thereon, to the debtors. It is further

ORDERED that the within chapter 11 proceedings be, and they are hereby, dismissed without prejudice to reinstatement upon retention of local counsel and the demonstration of other facts which may augur for success of the proceedings. And it is further

ORDERED that the questions of the priority and validity of the security interest of Sur Gro Finance Company may be litigated in other forums.