**In re TEREX CORPORATION, Debtor.**

**Bankruptcy No. 583–1502.**

United States Bankruptcy Court,
N.D. Ohio.

March 18, 1987.

See also, Bkrtcy., 45 B.R. 290, Bkrtcy., 53 B.R. 616.

Brouse & McDowell, Akron, Ohio, for unsecured creditors' committee.

Squire, Sanders & Dempsey, Cleveland, Ohio, for debtor and debtor in possession.

FINDING AS TO FINAL COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE OFFICIAL UNSECURED CREDITORS' COMMITTEE

HAROLD F. WHITE, Bankruptcy Judge.

On December 5, 1986 Brouse & McDowell, attorneys for the official unsecured

creditors' committee for Terex Corporation, filed its application for final compensation and reimbursement payments with supporting itemization requesting compensation in the sum of $14,815 plus expenses of $589.25. They further requested enhancement compensation of 20% of their total request for fees of $387,350, which would amount to $77,470, making a total request for compensation from the estate of the debtors in the amount of $464,820. On February 5, 1987 Terex filed an objection to the application, specifically as to the award of a compensation premium as requested. On February 11, 1987 Brouse & McDowell filed its reply to the objection. A hearing was held on February 13, 1987 after due notice was given to all creditors and interested parties.

At the hearing Brouse & McDowell presented three witnesses: Greg Foster, a representative of a member of the committee; W. Wallace Walker, an attorney with Baker & Hostetler experienced in bankruptcy law; and Joseph Hutchinson, a member of Brouse & McDowell. The objection of Terex to the testimony of W. Wallace Walker was sustained as to his opinion of the reasonableness of the fees requested. The objection of Terex to the creditors' committee's Exhibit B was also sustained, but creditors' committee's Exhibits A, C, D, and E were admitted. Based upon the testimony of the witnesses, the exhibits, the arguments of counsel, the briefs, and the complete file, as well as the court's experience with these proceedings over the last four years, the following Findings of Fact and Conclusions of Law are made.

## I. FINDINGS OF FACT

1. On November 4, 1983 Terex filed a petition under chapter 11 of the Bankruptcy Code and continued operating as a debtor in possession.

2. On December 20, 1983 Brouse & McDowell (herein "the firm") filed an application for appointment as counsel to the official unsecured creditors' committee (herein "creditors' committee") and an order was entered the same day approving the appointment.

3. On March 9, 1984 the firm filed its first application for interim compensation and reimbursement of expenses and it has filed ten subsequent interim applications. To date, the firm has been allowed $324,741 in compensation, has been disallowed $22,-164.50, and $25,629.50 is being held in abeyance. The interim fees have been allowed and paid in regular quarterly intervals since the inception of this case.

4. The hourly rate charged throughout has remained somewhat fixed, $150 per hour for the more experienced attorneys and between $100, and more recently, $120 per hour for the able, but less experienced attorneys. The firm has competently represented many creditors and debtors before this court in prior, unrelated cases.

5. In November, 1983 when Terex filed its petition under chapter 11 of the Bankruptcy Code, Terex was engaged in the manufacture and worldwide distribution of earthmoving and other heavy equipment. Terex has continued its operation throughout this proceeding, but has steadily downscaled its manufacturing operations, and liquidated a significant percentage of inventory and works in process. In April of 1985 Terex estimated its potential dealer claims upon liquidation to be between $43.4 million and $84.1 million. *See* Creditors' Exhibit E. On April 9, 1986 its first of the second generation of reorganization plans was filed containing a $2.9 million cap on unsecured claims of dealers. This cap remained consistent and is present in the final, confirmed, modified plan of reorganization. Terex negotiated modified assumption contracts with most of the dealers, thereby significantly reducing the potential dealer claims for rejection. Sedgewick Pacific, a former dealer, filed a claim for $4.9 million, which claim was reduced to $1,999,-227; an objection to the claim was filed, and the hearing on the allowability of the claim is currently pending.

6. Several other parties and interest groups had significant claims against the estate for credit extended and for prospec-

tive contract rejection claims. In January, 1984 First Wisconsin National Bank of Milwaukee (herein "First Wisconsin") filed an adversary proceeding in which it sought a setoff of approximately $5.1 million, the allowance of $3.6 million as an allowed secured claim, and the determination that $2 million cash collateral account was the collateral of First Wisconsin. Terex and First Wisconsin entered into a settlement agreement approved by this court in which First Wisconsin paid Terex $2 million in cash and each party relinquished its claims against the other party. See disclosure statement filed May 9, 1986.

7. In June of 1986 the collective bargaining agent for the former and current hourly employees of Terex, the UAW, had an estimated priority claim against the estate greater than $12 million, and asserted breach and rejection claims arising out of its collective bargaining agreements of approximately $18 million. These claims were successfully negotiated on the eve of the plan confirmation hearing, and an order was entered on October 16, 1986 approving a settlement in which the hourly workers would be paid ratably from the sum of $230,000 cash equal to $.0985 multiplied by the number of "paid hours" credited to him or her for the period of January 23, 1984 to March 14, 1986, an allowed claim in the total sum of $4.281 million to be paid ratably from the trust created for the benefit of the unsecured creditors, and certain fringe benefits guaranteed by the collective bargaining agreement. See modified plan of reorganization filed August 21, 1986 and joint motion for approval of compromise of controversies regarding class 2A claims filed August 4, 1986. Counsel for the firm stated the total unsecured claim of the UAW to be in the millions.

8. General Motors Corporation (herein "GM") filed unsecured claims in the aggregate sum of approximately $200 million, the majority of which arose from the GM-financed sale of its worldwide Terex operations to IBH, a German holding company, in January of 1981. See disclosure statement at 7 and 14. Approximately $107 million was outstanding on notes issued by IBH to GM guaranteed by Terex, $32 million owing from a guarantee by Terex of a debt owed to GM by Terex Ltd. and Terex do Brasil, $49 million owing from the Terex obligation to GM in connection with Terex's use of facilities in Hudson, Ohio and Brooklyn, Ohio leased from GM, $12 million for miscellaneous goods and services supplied by GM, and a priority claim for the use of the facilities by Terex during these proceedings. See disclosure statement at 14. In full settlement of its claims against the estate other than the priority claim and certain floor-financing claims, GM received preferred shares of the reorganized Terex with a stated liquidation value of $22 million, certain intellectual property, retained its property interest in the Hudson and Brooklyn, Ohio facilities, and in the personal property leased to Terex. GM will also receive $9.2 million in installment payments for the debtor's postpetition use of the facilities and personal property. See disclosure statement at 15 and modified plan of reorganization at 5 and 8.

9. IBH and other Terex affiliates filed claims against the estate totaling more than $114 million. The modified plan provides that IBH will be paid $10,000 for its allowed unsecured claims. See modified plan at 7 and 8.

10. In addition to the claims against the estate, other parties, including Metropolitan Life Insurance Company, the pension trust, and local taxing authorities, hold significant claims against the estate.

11. The effectiveness of the modified plan of reorganization filed August 21, 1986 was conditioned upon a number of contingencies: (1) a letter ruling from the IRS that the transfer of assets and liabilities as proposed by the plan enables the reorganized Terex to use the net operating losses of the debtor, (2) a collective bargaining agreement between the UAW and the debtor, (3) the aggregate class 3C claims (dealer claims) not exceeding $2.9 million, and (4) a court approved compromise between the UAW and the debtor as

to its claims against the estate. *See* modified plan of reorganization at 9 and 11.

12. At the time of confirmation Terex had approximately $26 million in cash, $70 million in inventories, and $30 million in receivables with which to back up its obligations under the plan. Terex also had a line of credit with Congress Financial Corporation of approximately $21 million which it intended to pay down to between $10 and $15 million. It further showed a positive cash flow for the last four out of five months.

13. The debtor estimated the allowed unsecured claims, exclusive of those unsecured claims of GM, the hourly and salaried workers, IBH and claims for less than $250, to be $14 million. In addition, the settlement reached with the UAW provides that the hourly workers will participate in the reorganization trust with an allowed claim of $4.281 million. The modified plan of reorganization which was confirmed by an order of this court entered September 2, 1986 provides for the installment payment of $8 million by the debtor to the trustee of the reorganization trust, backed by 100% of the authorized and outstanding common stock of the reorganized debtor. Both GM and TEL, a wholly-owned subsidiary of GM, have an option on the stock equal to the outstanding balance due the reorganization trust, and the option price is guaranteed by GM.

14. In January, 1985 the debtor offered to pay the unsecured creditors $1.25 million in cash in conjunction with a proposal by First Boston Corporation (herein "First Boston") to facilitate a reorganization plan; by mid-year, First Boston withdrew its interest in Terex. In the Fall of 1985 an offshore drilling company which was an affiliate of GM had a potential interest in buying Terex, but also withdrew its interest.

15. The firm admits it took an unusual and "creative" approach to its litigation strategy against GM. It based its legal theory upon a principle of equity which protects the creditors of a subsidiary which stock is sold by its parent to a third party, but which subsidiary subsequently fails. Equity declares the proceeds of the sale an illegal dividend. The firm would ask legal jurisprudence to extend this principle of equity to an asset sale, and apply this analogy to the GM sale of Terex to IBH in January of 1981, asking the court to subordinate the claims of GM to other unsecured creditors. GM flatly denied that there was a factual or legal basis for this theory. *See* Creditors' Exhibits A and D.

16. Joseph Hutchinson, a member of the firm, testified that the creditors' committee in early 1985 initially approved the offer of First Boston to fund a plan, but this was without the benefit of a liquidation analysis. He testified that the $1.25 million offer went up to $6.1 million plus the First Wisconsin litigation in the summer of 1985. The creditors' committee attempted to intervene as a party to this litigation, but its application was denied. *See* order entered September 16, 1985 and orders entered October 31, 1985 and February 20, 1986 disallowing fees for firm time spent monitoring this litigation as unnecessary and excessive. He further testified that in February of 1986 the firm persuaded the creditors' committee to authorize the firm to file a motion for authority to file a complaint against GM on behalf of the estate, and he testified that it was at this time that he received a new offer to pay the unsecured creditors $8 million.

17. The debtor filed several reorganization plans with varying funding patterns for the trust created to distribute payments to the unsecured creditors:

(a) on November 18, 1985 a plan was filed proposing payment of $7.3 million in cash and an assignment of Terex's claims against First Wisconsin, stated in its third amended counterclaim to be in excess of $14.5 million plus punitive damages, exclusive of its rights to funds in a cash collateral account claimed to be in excess of $6 million;

(b) on April 9, 1986 a modified plan was filed proposing installment payment of $8 million in cash, backed by all of the

authorized and outstanding common stock of the reorganized debtor; and

(c) subsequent modified plans were filed June 17, 1986, June 20, 1986, August 4, 1986, August 7, 1986, August 12, 1986, and August 21, 1986, all of which provided for the installment payment of $8 million in cash backed by all of the authorized and outstanding common stock of the reorganized debtor.

18. The final, confirmed, modified plan of reorganization indicates movement on both sides of the negotiation. Terex began bargaining from a 5% position, and the creditors' committee began at 80%. Both sides agree that the confirmed plan will provide a dividend of approximately 25% to 30% of the allowed unsecured claims. *See also* disclosure statement at 6 which estimates a distribution of between $.23 to $.28 on the dollar to general creditors of the estate. Terex, the UAW, the creditors' committee, and GM were all involved in the final negotiations.

19. There were no additional assets brought into the estate. Therefore, the efforts of the creditors' committee's attorneys did not enhance the estate in that respect.

20. A complaint against GM containing the novel theory propounded by the firm to the court at this hearing was never filed with this court, and no contingency fee agreement was ever entered into between the firm and the creditors' committee.

21. The expert witness presented by the firm, W. Wallace Walker, is a member of another firm, Baker & Hostetler, which represented one of the most contentious factions, First Wisconsin, in this case. First Wisconsin's last appearance in this case was in May of 1986 when it reached a settlement with Terex. *See* order entered May 13, 1986.

## II. ISSUES

1. Whether the testimony of an expert witness testifying from the bankruptcy files of the attorneys for the creditors' committee in this case is admissible opinion evidence as to the "reasonableness" of the

upward scaling of fees by means of a 20% bonus as requested by the firm?

2. Whether a 20% bonus in fees is reasonable under the circumstances of this case?

3. Whether the final allowance requested by the firm, apart from the 20% bonus, is reasonable under the circumstances of this case?

## III. DISCUSSION OF FIRST ISSUE

 Section 330(a) of the Bankruptcy Code prescribes the standards by which compensation for services and reimbursement of expenditures may be awarded officers of the estate appointed under § 1103(a):

> After notice to any parties in interest ... the court may award ... to a professional person employed under section 327 or 1103 of this title ...
>
> (1) reasonable compensation for actual, necessary services rendered by such ... professional person ... based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title; and
>
> (2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a) (Collier 1983). Applications for fee awards are addressed to the sound discretion of the bankruptcy court. *Neville v. Eufaula Bank & Trust Co. (In re U.S. Golf Corp.)*, 639 F.2d 1197, 1201 (5th Cir.1981). Expert testimony is not necessary to establish the value of an attorney's services since a judge is "presumed knowledgeable as to fees charged by attorneys in general and as to the quality of legal work presented to him by particular attorneys." *Commerce Bank v. Colin (In re Colin)*, 44 B.R. 709, 713 (Bankr.W.D.Mo. 1984) (quoting *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.* 487 F.2d 161, 169 (3d Cir. 1973)). Expert testimony is admissible—

If scientific, technical, or other specialized knowledge *will assist the trier of fact* to understand the evidence or to

determine a fact in issue[;] a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702 (emphasis added). The general test for admissibility is whether the testimony will aid the trier of fact to understand evidence. 11 J. Moore and H. Bendix, *Moore's Federal Practice*, § 702.-10[1] at VII–23 (1985). "[W]here the [trier of fact] is reasonably well-equipped to interpret the facts without enlightenment from an expert, the latter's testimony is superfluous." *Id.* at § 702.02 at VII–22.

> [E]xpert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge "[if the trier of fact is] capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation...."

*Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). This court modestly proposes that it is capable of making such determinations as the Bankruptcy Code vests it with this authority and it has consistently reviewed these matters in its almost thirty-year tenure. The court is vested with "wide discretion in determining whether or not expert testimony is admissible," and its rejection of such testimony will not be disturbed unless "manifestly erroneous." *Bridger v. Union Railway Co.*, 355 F.2d 382, 387, and 388 (6th Cir.1966). *See also Huess v. Rockwell Standard Corp.*, 495 F.2d 1207, 1210 (6th Cir.1974) (manifestly erroneous standard) and *United States v. Barker*, 553 F.2d 1013, 1024 (6th Cir.1977) (clearly erroneous standard). If the proffered testimony does not assist the trier of fact in understanding the evidence, it may be stricken as superfluous and not serving to advance the inquiry before the court. *See also*, Fed.R. Evid. 102 and 403.

## IV. DISCUSSION OF SECOND ISSUE

In arriving at a reasonable fee under § 330(a), the court takes into account the documented time and customary billing rates, the quality of the advocacy, taking into account the difficulty of the issues presented and any time constraints, and the results achieved for the estate and its creditors. *In re Penn-Dixie Industries, Inc.*, 18 B.R. 834, 838–839 (Bankr. S.D.N.Y. 1982). See *In re Mansfield Tire & Rubber Co.*, 65 B.R. 446 (Bankr.N.D.Ohio 1986) for an in-depth discussion of the various measures used by bankruptcy courts in arriving at "reasonable compensation." The burden of proof to establish the entitlement to, and reasonableness of, fees is upon the applicant, and the court is not compelled to award the fees requested merely because there are no objections to the application by interested parties. *See Mansfield Tire & Rubber* at 455 and cases cited therein.

The applicant urges that the presence of these factors in its representation of the creditors' committee justifies an enhancement or 20% bonus of its aggregate request which was based upon its hourly rates: the complexity of the issues and skill of counsel, the results obtained, and the contingent nature of expected payment. At the hearing on its application it also emphasized the "creative" and "novel" approach it took in its equitable subordination theory against GM, the divided interests it represented on the committee, and its "extraordinarily good results." A "novel" approach is not necessarily a correct approach, and a "creative" theory is not necessarily a meritorious one. Counsel admitted from the witness stand that no legal precedent existed for its theory of recovery against GM.

Nor can the court assume the tunnel vision with which the firm views its efforts at engaging GM in never fought battles over uncharted waters of jurisprudence. Although the court does not question the firm's sincerity in its belief, the firm may have been jousting with legal windmills. On November 11, 1985 Terex filed its first plan of reorganization which called for a

cash distribution to the trust created for the benefit of the unsecured creditors in the sum of $7.3 million and an assignment of Terex's claims against First Wisconsin optimistically totaling approximately $4.5 million plus punitive damages. Earlier, there had been rumors of a $6 million plan, and beginning in April of 1986, Terex filed its first of seven plans proposing cash payment of $8 million backed by all the common stock of the reorganized debtor. From this sequence of events the court does not conclude that an $8 million settlement for the unsecured creditors was sprung on the firm on the eve of its proposed filing of its motion for authority to file a complaint in mid-February, 1986. With the benefit of hindsight the court can see that the $7.3 million plan could have even benefited the unsecured creditors more as the First Wisconsin litigation was settled for a $2 million payment to Terex. *See* disclosure statement at 16–17. But that plan was apparently unconfirmable for reasons to which this court is not privy. The firm would have this court award a bonus for successfully negotiating a 30% plan where initially, the debtor was offering 5% and the committee was demanding 80%. There was more movement to a middle ground on the part of the committee, and the court agrees that this movement reflects part of the "normal bargaining process between parties." Objection of Terex to application at 4.

The increase in the size of the fund for the unsecured creditors was inversely proportional to the size of Terex's operations. Throughout these proceedings Terex reduced production, laid off employees, sold off inventory and works in process, and closed manufacturing facilities. It successfully negotiated modified dealer contracts thereby reducing a significant class of prospective unsecured claims. It successfully negotiated a settlement in the First Wisconsin litigation which brought in an additional $2 million to the state. The liquidation scenario at the outset was improved with the passage of time and these diligent efforts. It actively sought throughout these proceedings a buyer for its down-scaled operations, and as the court was advised at the hearing, it has been sold to Northwest Engineering.

The firm's belief that the $8 million payment to unsecured creditors under the plan is the result of its solitary efforts and willingness to engage GM in litigation is based upon pure conjecture and speculation. The court cannot view the events over the last four years with the myopic vision that the firm suggests. There were several other large creditors in this drama, each with a significant stake in the outcome, and some admittedly had the ability to affect the final reorganization or liquidation of the debtor. *See* finding as to motion for order requiring debtor in possession to assume or reject executory labor agreements at 8, and 10–11 entered June 16, 1986. *See also*, modified plan of reorganization at 9 and 11.

In support of its position the firm offers two letters from representatives of GM expressing its surprise at the position of the firm regarding the theory of equitable subordination and declaring its resolve to defend any litigation. One can hardly expect any other response since the legal theory admittedly has no prior legal precedent. The firm's brief in support of its application is also filled with self-serving declarations, hearsay, conclusions based upon hearsay assumptions, and conjecture; the evidence offered at the hearing also failed to support the award of a 20% bonus. The extent to which the efforts of the firm on behalf of the creditors' committee affected the final participation of GM in the plan is something this court will likely never know. The impending enactment of a new federal tax code with lower corporate rates of income taxation may have had a significant effect on GM and any prospective purchaser. Counsel for the firm represented the committee skillfully, especially in the face of diverse, and sometimes adversarial, interests of the committee. The results obtained for the unsecured creditors look good at this point, but the final dividend to be paid to the unsecured creditors is dependent upon the costs of admin-

istration of the reorganization trust in addition to the costs incurred for professional time in objecting to, and settling, claims. This case is not ready to be closed; the distributions from the trust will be made at least once every twelve months "until termination of the Trust." Reorganization Trust Agreement at 7, Exhibit A to modified plan of reorganization.

Skill of individual counsel is represented in his or her hourly rate. The more experienced and skillful the individual, the higher the rate. To a great extent, the complexity of the issues is also represented by the firm's hourly charges. More complex or novel issues may require more hours of negotiation, intraoffice discussion, and research. The court has consistently allowed payment to the firm in its interim applications at the rates itemized and for the time itemized, even when three lawyers from the firm appeared at one meeting. The firm's novel legal theory has taken its members to Germany for a facts investigation; the court has allowed these expenses and this professional time.

The "contingency" of payment for its efforts was a nonexistent risk to the firm. The firm has filed quarterly interim applications for compensation, and has been allowed and paid quarterly payments totaling $324,741 in fees and allowed and paid the majority of its expenses. Only $25,629.50 has been held back, and the court will directly rule on that allowance. The contingency of its fees if it secured leave of court to file a complaint against GM, if it indeed filed the complaint and if it accepted a contingency fee with court approval, was never a reality. The motion for authority was never filed and the litigation never commenced. This case involved many different factions and several areas of law, but did not approach the complexity of issues of other chapter 11 cases on a national standard, such as Continental Airlines, Johns-Manville, or LTV Steel. This court is well aware that other courts have awarded law firms "enhancements" or "premiums" or "bonuses" in other cases. *See, e.g., Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green (In re Bos-*

*ton & Maine Corp.)*, 778 F.2d 890 (1985) (legal services rendered bankrupt railroad by special counsel in eminent domain proceedings); *In re White Motor Corp.*, 50 B.R. 885 (Bankr.N.D.Ohio 1985) (total fees and expenses of almost $23 million in one of the largest chapter 11 reorganizations filed at that time); and *Bible Deliverance Evangelistic Church*, 39 B.R. 768 (Bankr. E.D.Pa.1984) (efforts of counsel for creditors' committee resulted in all creditors being paid in full with interest). *But see, In re Consolidated Bancshares, Inc.*, 785 F.2d 1249 (5th Cir.1986). The court does not find that this case is an appropriate one for the award of a bonus, and has serious doubt as to whether an occasion will soon arise when the award of a bonus is necessary to award a "reasonable" fee. Attorneys in private practice do not bill their clients for a lump sum bonus based upon good results achieved. Presumably, that is what they are hired to accomplish. The closest analogy which can be made is the award of a contingency fee for successful litigation or settlement. But the risk is zero payment, and that risk was not present here.

Counsel for both Terex and the firm have cited to cases outside of the bankruptcy arena. *See, e.g., Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) and *Boston Maine Corp.*, 778 F.2d 890. Statutory fees in class action civil rights litigation and eminent domain litigation are by their nature contingent, and the policy considerations for such awards differ significantly from the bankruptcy arena where the court focuses on benefit to the estate and its creditors. No bonus or enhancement will be awarded in this case.

## V. DISCUSSION OF THIRD ISSUE

The court has reviewed the balance of the fee application by the same standards it employed in reviewing the interim fee applications of the firm. The court concludes that the charges itemized are reasonable, in light of the competent representation of the committee by its counsel. In its order allowing interim compensation to the firm

which was entered October 31, 1985 the court held back $2,380 for professional time spent investigating and researching the possibility of litigation against GM. Now that a plan of reorganization has been confirmed and the debtor has successfully reorganized, the court allows the firm compensation for fees as attorneys for the creditors' committee the amount of the hold-back of $25,629.50, plus the hold-back of $2,380, plus the current application as filed with this court in the amount of $14,-815, plus expenses of $589.25, making a total allowance for compensation out of this estate in the amount of $367,565.50.

A separate order in accordance with this Finding will be entered hereon.