**In re the MORRIS PLAN COMPANY OF IOWA.**

**In re MORAMERICA FINANCIAL CORPORATION, Debtor.**

**Bankruptcy Nos. L85–01852C, L85–01853C.**

United States Bankruptcy Court, N.D. Iowa.

April 13, 1989.

Dixon & Dixon, P.C., Omaha, Neb., Carl Schuettpelz, Cedar Rapids, Iowa, for debtor.

Thomas Wilkinson, Cedar Rapids, Iowa, for Unsecured Creditor's Committee for MorAmerica Financial Corp.

Harry Terpstra, Cedar Rapids, Iowa, for Unsecured Creditor's Committee for The Morris Plan Co. of Iowa.

## MEMORANDUM AND ORDER Re: Request for Fee Enhancement

MICHAEL J. MELLOY, Chief Judge.

The matter before the Court is a Request for Fee Enhancement filed by counsel for Debtors, Dixon & Dixon, P.C. (Dixon & Dixon). Dixon & Dixon requests a fee enhancement of $25,000 in each of the above captioned cases, based on the "exceptional results" obtained in each case. The request is opposed by the Unsecured Creditor's Committee in each case.

The following constitutes the Findings of Fact, Conclusions of Law and Order as required by Fed.R.Bankr.Proc. 7052.

## BACKGROUND AND FINDINGS OF FACT

MorAmerica Financial Corporation ("MorAmerica") and The Morris Plan Co. of Iowa, Inc. ("Morris Plan") filed for relief under Chapter 11 of the Bankruptcy Code on August 30, 1985. For purposes of administration the cases have been consolidated. The two cases involved over 150 million dollars in assets and liabilities. There are in excess of 20,000 creditors between the two cases. These cases easily constitute the largest reorganization cases ever filed in the Northern District of Iowa.

MorAmerica is a financial holding company which owns a large number of subsidiary corporations. Morris Plan is one of the subsidiaries of MorAmerica. Morris Plan is an industrial thrift corporation organized and chartered pursuant to the laws of the State of Iowa. At the time the case was filed, Morris Plan was under the regulatory control of the Iowa State Auditor's Office. Subsequent to the filing of the case, the regulatory control of industrial thrifts in Iowa was transferred to the Superintendent of Banking.

These cases generated very significant public interest. Virtually all of the creditors in both cases were individual investors who invested all or part of their life savings in thrift certificates or debentures issued by MorAmerica and Morris Plan. The level of public interest was demonstrated by the attendance at the First Meeting of Creditors. It was estimated that several thousand persons attended the First Meeting of Creditors. The First Meeting of Creditors had to be adjourned to a larger facility in order to accommodate the unprecedented number of people who wished to attend the meeting.

The law firm of Dixon & Dixon, P.C. of Omaha, was appointed as counsel for the Debtors. Dixon & Dixon has a nationwide reputation for its expertise in the area of business reorganizations under the Bankruptcy Code. Members of that firm represent both debtors and creditors in bankruptcy proceedings throughout the United States.

The lead counsel in the case was Attorney Harry Dixon. Mr. Dixon is the senior bankruptcy attorney in the firm of Dixon & Dixon. Mr. Dixon has a well deserved nationwide reputation as one of the country's foremost bankruptcy practitioners. Mr. Dixon was counsel and consultant to the Senate Judiciary Committee during the period of 1975–1978 when the Bankruptcy Code of 1978 was being drafted and subse-

quently enacted. Mr. Dixon actively participated in the drafting of Chapter 11 and the legislative history thereto. Since that time, Mr. Dixon has been an active practitioner in the business reorganization area. He has recently been appointed by Chief Justice William Rehnquist as a member of the Advisory Committee on Bankruptcy Rules of the Judicial Conference of the United States. Mr. Dixon is Chairman of the American Bankruptcy Institute, the largest organization devoted to bankruptcy in the country. Mr. Dixon is also a frequent lecturer at educational conferences across the country.

Mr. Dixon personally devoted substantial time to the formulation of the reorganization plan in this case and the ultimate confirmation of the plan of reorganization. This is the type of case that demanded Mr. Dixon's expertise and personal attention. Due to the size of the case, number of creditors, difficult negotiations which led up to the confirmation of the plan and the novelty and difficulty of the legal issues presented, this is not the type of case which could have been entrusted to a junior member of the firm. The case did demand and receive Mr. Dixon's personal attention and commitment of time.

The case presented a number of obstacles which were successfully overcome by Mr. Dixon, as Attorney for Debtor, with the assistance of the very able counsel for the Creditor's Committees. Two of the most significant problems revolve around the difficult negotiations with Peter Bezanson and the members of the Bezanson family, as well as the regulatory environment within which the companies operated.

All of the voting stock of MorAmerica was owned either by Peter Bezanson or members of his immediate family. Hence, control of MorAmerica rested solely in the Bezanson family. In many instances, Debtors' counsel were obligated to argue for plan provisions which were in the best interest of the estate but not necessarily consistent with the desires of the owners of the company, that is the Bezanson family. Negotiations with Peter Bezanson and the members of his family were difficult and complicated. Those negotiations culminated in the development of a plan which contained provisions which gave the maximum possible protection to the creditors and hopefully will return to creditors a 100% dividend, with interest, on their claims.

The plan that was confirmed also removed all members of the Bezanson family from any control of either MorAmerica or Morris Plan. The plan received the support of the Creditor's Committees and was overwhelmingly approved by the creditors of MorAmerica and Morris Plan. The plan was eventually approved over the objection of Mr. Bezanson, who then filed an appeal of the confirmation order. That appeal was eventually resolved by a settlement agreement between the Debtor corporations and Mr. Bezanson which resulted in Peter Bezanson turning over virtually all of his nonexempt assets to MorAmerica and Morris Plan.

Mr. Dixon's skill and expertise may have been best demonstrated in his work with the applicable regulatory agencies who have been involved in the plan confirmation process and subsequent confirmation of the plan. As indicated, during the course of the case, the regulatory authority over industrial thrifts was changed from the Iowa State Auditor to the Superintendent of Banking. This change resulted in some modification in the position the regulators were taking towards the plan which was ultimately confirmed in this case. The Superintendent of Banking insisted upon removal of both Peter Bezanson and his son-in-law, Jerry Maples, from any involvement with either MorAmerica or Morris Plan. While this position was strongly supported by the Creditor's Committees, it did make the negotiations with the Bezanson family much more difficult. Mr. Dixon had to be the mediator between these various conflicting interests in formulating a plan which could ultimately be confirmed in this case.

An even more serious regulatory challenge ensued after the plan was confirmed. The plan provided for the creation of a new federally insured savings and loan. The

Debtor hired regulatory counsel in Washington, D.C. to handle the application to the Federal Home Loan Bank Board for the issuance of FSLIC insurance. The initial application was unexpectedly turned down. This development severely jeopardized the prospects for the continued reorganization of these two entities. When that development occurred in December, 1987, the prospect of a conversion to a Chapter 7 and eventual liquidation of these two entities was a very distinct possibility.

Subsequent to the initial denial of the application for insurance by the Federal Home Loan Bank Board, Mr. Dixon became personally involved in the application process. He used his experience as a former Senate committee counsel and his extensive political contacts to expedite the review of the revised application for FSLIC insurance which was submitted after the initial denial of insurance. While Mr. Dixon's efforts did not affect the decision on the merits of the application, he was able to impress upon the applicable regulatory authorities the urgency of the situation, the hardships being imposed upon the creditors of MorAmerica and Morris Plan, and the need for a very prompt decision as to whether the subsequent application for insurance would be approved. Eventually that application was approved and the reorganized savings and loan opened for business in November, 1988.

The plan as confirmed will pay to Morris Plan creditors 100% of each claim, plus interest at 5%, in annual installments from 1987 through 1993. MorAmerica creditors will be paid 100% of each claim with interest at 5% in annual installments from 1989 through 2002. The senior MorAmerica debenture holders will be paid their entire principal first, with the subordinated debenture holders being paid after the senior debt has been retired. All creditors, including the MorAmerica subordinate debenture holders, will receive annual interest payments on their claims at the rate of 5% per annum.

While the plan provisions are not without certain risks, the plan does offer a realistic prospect that all creditors will eventually be paid in full with interest. In a liquidation scenario, creditors would have received substantially less than full payment. Depending upon the resolution of certain issues having to do with inter-company debt, in the event of a liquidation Morris Plan creditors could have received as little as 65% of their claim without interest, and MorAmerica senior debenture holders would have received only about 27% of their claims. In any liquidation scenario the subordinate debenture holders of MorAmerica would have received nothing. While the subordinate debenture holders of MorAmerica will not be receiving any principal payments for several years, they are receiving annual interest payments equal to 5% of their claim, which in and of itself, is more than they would have received in a liquidation.

The Court recognizes that the confirmation of the plan in this case was the result of hard work by a number of individuals. The Court does not mean to slight the very substantial contributions made by Harry Terpstra and Ray Terpstra, Attorneys for the MorAmerica Creditor's Committee, and Thomas Wilkinson and John Costello, Attorneys for the Morris Plan Unsecured Creditor's Committee, as well as the substantial efforts made by the Iowa Superintendent of Banking, Federal Regulatory Officials and the management of Morris Plan and MorAmerica. However, the Court does believe that Mr. Dixon and the Dixon & Dixon firm should be commended for performing an exceptional job in this case under very difficult and trying circumstances.

Dixon & Dixon has filed a number of interim fee applications in each case. Those fee applications have been approved without objection by either the Creditor's Committee or any other party in interest. The request for fee enhancement has been made as part of Dixon & Dixon's final fee application. The Court has approved the final fee application while reserving a ruling as to the fee enhancement issue. Review of the court file in this case shows that Dixon & Dixon have been awarded, through the final fee application, a total of $192,270.25 in the Morris Plan case and

$262,593.25 in the MorAmerica case. Total fees reflect an average hourly rate of $102.15 per hour for all professionals that have worked on the case.

The Court recognizes that Dixon & Dixon has received substantial compensation for their time and efforts in these cases. However, the evidence and testimony presented at the hearing on the fee enhancement shows that the fees are relatively modest for the size and complexity of the cases involved. By way of an example, the evidence showed that the total fees awarded to Debtor's counsel in the *Pester* case from the Southern District of Iowa, also a 1985 case and probably the largest case ever filed in the Southern District of Iowa, exceeded $800,000. The testimony also revealed that the hourly rate charged was modest considering the background and experience of the attorneys involved with the Dixon & Dixon firm and, again, taking into consideration the size and complexity of the cases involved.

## DISCUSSION

■ The starting point in a bankruptcy case for determination of the amount of attorney's fees to be allowed begins with 11 U.S.C. § 330(a) which provides:

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) *reasonable compensation* for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a) (emphasis added).

The highlighted language above, "reasonable compensation," is the key language in 11 U.S.C. § 330(a). In bankruptcy cases, "reasonable compensation" usually is determined by multiplying a reasonably hourly rate by the number of hours actually and reasonably expended. This figure is generally known as the "lodestar amount" and is regarded as being a presumptively reasonable fee. *In re Manoa Finance Co., Inc.*, 853 F.2d 687, 691 (9th Cir.1988). A number of courts have considered the question of whether and under what circumstances they should allow an upward adjustment of the presumptively reasonable lodestar amount. In the most recent Circuit Court decision on the issue, *In re Manoa Finance Co., Inc.*, 853 F.2d 687 (9th Cir. 1988), the court held that an upward fee adjustment could be granted under 11 U.S.C. § 330(a), but only in "rare and exceptional" circumstances. The *Manoa Finance* court was faced with the situation where the bankruptcy court had held that in no circumstances could an upward fee adjustment be allowed under 11 U.S.C. § 330. The *Manoa Finance* court held that such an adjustment could be allowed and remanded the case to the bankruptcy court to make findings to determine whether that case was in fact a "rare and exceptional" case warranting such an upward fee adjustment.

Numerous courts have been faced with a request for fee enhancement and virtually all have concluded that an upward adjustment of the lodestar amount may be allowed. The more troublesome question the courts face is whether the case before it is a rare and exceptional case warranting such an enhancement. *See e.g., In re Powerine Oil Co.*, 71 B.R. 767 (9th Cir. BAP 1986) (Upholding 50% upward fee adjustment based on combination of results obtained and contingencies as to payment); *In re Summit Communities of Florida, Inc.*, 84 B.R. 863 (Bankr.S.D.Fla.1988) (Court awarded approximately 30% in upward adjustments of fees of Debtor's general and special counsels); *Matter of Bald-*

*win–United Corp.,* 79 B.R. 321 (Bankr.S.D. Ohio 1987) (Court awarded bonus of approximately 10% to various counsels involved based on results obtained); *see also Matter of Lawler,* 807 F.2d 1207 (5th Cir. 1987) (Act case; Court allowed an upward fee adjustment of approximately 70%); *but see Matter of Consolidated Bancshares, Inc.,* 785 F.2d 1249 (5th Cir.1986); *In re Schumann Tire & Battery Co., Inc.,* 89 B.R. 223 (Bankr.M.D.Fla.1988); *In re Kel–Wood Timber Products Co.,* 88 B.R. 93 (Bankr.E.D.Va.1988); *In re McLean Indus., Inc.,* 88 B.R. 36 (Bankr.S.D.N.Y.1988); *In re First Software, Corp.,* 79 B.R. 108 (Bankr.D.Mass.1987); *In re Terex Corp.,* 70 B.R. 996 (Bankr.N.D.Ohio 1987); *Matter of Schaeffer,* 71 B.R. 559 (Bankr.S.D.Ohio 1987); *In re Seneca Oil Co.,* 65 B.R. 902 (Bankr.W.D.Okla.1986) (all denying fee enhancement although acknowledging that in a "rare and exceptional" case a fee enhancement may be warranted); *see also, In re Fall,* 93 B.R. 1003 (Bankr.D.Or.1988) (Concluding "that the degree of difficulty of the case, the quality of representation, and the extent of the benefit to the creditors play[s] no role in determining whether a bonus or enhancement should be awarded.").

In reaching the legal conclusion that a fee enhancement may be justified in a "rare and exceptional" case, the courts almost unanimously look to fee-shifting statute precedent. Congress has enacted numerous statutes authorizing the award of attorney fees to the prevailing party, in many instances. *See Coulter v. State of Tennessee,* 805 F.2d 146, 152–55 (6th Cir. 1986) (Listing over 125 different federal statutes which allow courts to award attorney's fees); *see also Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 261 n. 33, 95 S.Ct. 1612, 1623 n. 33, 44 L.Ed.2d 141 (1975) (Citing numerous cases which allow for attorney's fees under "selected statutes granting or protecting various federal rights."). These federal statutes reverse what is generally considered to be the "'American Rule' that the prevailing party may not recover attorneys' fees as costs or otherwise." *Alyeska Pipeline Service Co. v. Wilderness Society,* 421

U.S. 240, 245, 95 S.Ct. 1612, 1615, 44 L.Ed.2d 141 (1975) (Noting that absent statutory authority, the "prevailing litigant" ordinarily is not entitled to collect a reasonable attorneys' fee from the loser).

The Supreme Court has addressed the issue of fee-enhancements several times, in the context of the usual fee-shifting statutes. The Supreme Court first stated that the lodestar determination is only a starting point. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The court stated "there remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of 'results obtained'". *Hensley v. Eckerhart,* 461 U.S. at 433, 103 S.Ct. at 1940. Since that decision, the Supreme Court has periodically limited the availability of fee enhancements. For example, in *Blum v. Stenson,* 465 U.S. 886, 899, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984), the court limited its holding in *Hensley v. Eckerhart* by noting that it would be a "rare" and "exceptional" case where a fee enhancement would be allowed. Likewise, the *Blum v. Stenson* court also noted that the results obtained by counsel's representation would be reflected in the factors used to determine the lodestar rate, and therefore this factor "normally should not provide an independent basis for increasing the fee award." *Blum v. Stenson,* 465 U.S. at 900, 104 S.Ct. at 1550.

In *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley I),* 478 U.S. 546, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986), the Supreme Court further tightened its interpretation of when a fee enhancement may be allowed. In *Delaware Valley I* the court noted that the quality of a prevailing party's counsel would be reflected in the reasonable hourly rate. Therefore, the quality of performance should not be used to adjust the lodestar. The court noted that specific evidence regarding why the adjustment was necessary was required to be made by the trial court. In *Pennsylvania v. Delaware Valley Citizens' Council (Delaware Valley II),* 483 U.S. 711, 107 S.Ct. 3078, 3091, 97 L.Ed.2d 585 (1987), the court

addressed the question that it left open in *Delaware Valley I:* whether the lodestar could be adjusted upwards on the basis of the risk of non-payment. The Supreme Court noted that if there was a "real risk of not prevailing [on an] issue in the case, an upward adjustment to the lodestar may be made, but, as a general rule, in an amount no more than ⅓ of the lodestar." *Delaware Valley II,* 107 S.Ct. at 3089.

The Supreme Court's most recent pronouncement on the issue of contingency and fee enhancements is to be found in *Blanchard v. Bergeron,* —— U.S. ——, 109 S.Ct. 939, 946, 103 L.Ed.2d 67 (1989). In that case, the court held that counsel's fees would not necessarily be limited by the fee arrangement he or she had with his or her client, but that the trial court could adjust the fee upwards or downward from that contract depending on the circumstances of the case.

Most courts interpreting 11 U.S.C. § 330 consider the Supreme Court precedent regarding the fee-shifting statutes as instructive on the issue of whether a fee enhancement should be allowed, but not strictly determinative. *See e.g., In re Manoa Finance Co., Inc.* 853 F.2d 687, 689–91 (9th Cir.1988); *In re Baldwin–United Corp.,* 79 B.R. 321, 344–46 (Bankr.S.D.Ohio 1987). Both the *Baldwin–United Corp.* and the *Manoa Finance* cases concluded that bonuses or fee enhancements under § 330 are allowable, but only in a "rare and exceptional" case. The "rare and exceptional" case standard appears to be the general rule that existed in bankruptcy cases before the Supreme Court fee-shifting statute decisions. For example, in *Wolf v. Frank,* 555 F.2d 1213, 1218 (5th Cir.1977), the Fifth Circuit Court of Appeals allowed a fee enhancement of 33%. Likewise, in 1980 the Fifth Circuit allowed a fee enhancement of approximately 17%. *Rose Pass Mines, Inc. v. Howard,* 615 F.2d 1088, 1092 (5th Cir. 1980). In each of these cases the Fifth Circuit allowed the fee enhancement because of the results obtained. While in neither case did the court specifically state that the case before it was a "rare and exceptional" case, such a finding is implicit from the facts that the court elucidated. For example, in *Wolf v. Frank,* the court noted that the counsel succeeded in "accomplishing a substantial recovery for their clients." *Wolf v. Frank,* 555 F.2d at 1218. Additionally, the court noted that "if there was no recovery there would be no pay, with many hundreds of hours lost." *Id.* The court went on to note that the allowance of the fee enhancement was "precedent applying to these facts only." *Id.* In the *Rose Pass Mines* case, the Fifth Circuit allowed a 10% bonus "because of the excellent job on appeal" that the attorney had done. *Rose Pass Mines,* 615 F.2d at 1092 n. 9.

The question the Court faces, therefore, is whether this case is a "rare and exceptional" case warranting a fee enhancement, and if so, what the amount of that enhancement should be. First, the Court finds that this is a rare and exceptional case warranting a fee enhancement. In the Findings of Fact set forth above, the Court has detailed the facts which the Court believes compels such a conclusion.

The Court is reluctant to single out any one area of legal services which would warrant a fee enhancement. However, the Court does believe (and apparently the Morris Plan Creditor's Committee concurs) that the efforts of Dixon & Dixon in obtaining the FSLIC insurance for the new savings and loan were not fully compensated for in the fee applications submitted to date. The importance of the savings and loan to the plan of reorganization cannot be overemphasized. Without the necessary FSLIC insurance the plan simply could not perform and liquidation would have to follow. The Court concludes that the skill and expertise shown by Dixon & Dixon in obtaining the insurance is not adequately reflected in the lodestar rate.

Further, Dixon & Dixon showed great expertise in taking two entities which were in dire financial straits and fashioning a plan which would result in a successful reorganization. When the cases were commenced, the likelihood that the cases would end up being converted to Chapter 7 liquidation appeared quite high. As indicated in the Findings of Fact, such a conversion to liquidation would have resulted in a very substantially reduced payout to creditors as opposed to the proposed payout in the

confirmed plan. It has been estimated that the additional payment to creditors under the plan as opposed to the payment to be received in a liquidation may exceed 40 million dollars. Due to the efforts of Dixon & Dixon in obtaining confirmation of the plan, this additional 40 million dollars has been preserved for the benefit of the depositors. Thus, the general unsecured creditors are the ones that have benefited the most from Dixon & Dixon's efforts.

■ While the Court is not unsympathetic to the argument of the MorAmerica creditors that they have yet to receive a principal payment, the Court must point out that they are at least receiving interest payments under the confirmed plan and in time will receive payments of principal. As indicated in the Findings of Fact, this is certainly more than the subordinated debenture holders would have received in a Chapter 7 liquidation. While the idea of tying any bonus or fee enhancement to the ultimate principal payments to be received by the MorAmerica Creditors holds some appeal, the Court is convinced that such a payment plan would unduly prolong and complicate the administration of this case.

Having established that this is a rare and exceptional case in which a fee enhancement is warranted, the question then becomes in what amount should a fee enhancement be allowed. The Supreme Court has indicated that in the rare and exceptional case where a fee enhancement is to be allowed, the enhancement should be no greater than one-third of the lodestar amount. *See Delaware Valley II,* 107 S.Ct. at 3089. Dixon & Dixon proposes a flat $25,000 bonus in each case. The bonus comes out to be approximately 11% of the total fees which have been allowed.

One of the concerns raised by the Creditors' Committees is the issue of whether the fee enhancement should be the same in each of the cases. It would appear from a review of the court files as well as the fee applications filed to date that more work has been done in the MorAmerica case than in the Morris Plan case. Taking that concern into consideration, the Court is of the opinion that it would be a more equitable distribution of the bonus if the fee enhancement were calculated as a percentage of fees which have been allowed in each case. The Court, having heard the testimony and having reviewed this matter, believes that a 10% bonus in each case would adequately compensate the attorneys and would be an appropriate fee enhancement.

The Court has previously found that the fees allowed to Dixon & Dixon in the Morris Plan case total $192,270.25. Consequently, the fee enhancement to be allowed in the Morris Plan case will be $19,227.00. The fees previously allowed in the MorAmerica case totaled $262.593.25. The fee enhancement to be allowed in that case will be $26,259.00. The firm of Dixon & Dixon will be allowed additional compensation as part of its final fee application in each of the cases for the amounts indicated.

### ORDER

IT IS THEREFORE ORDERED that in addition to the previous allowance of fees and disbursements in this case, the firm of Dixon & Dixon, P.C., will be allowed a fee enhancement as an administrative expense in the Morris Plan case in the sum of $19,227.00 and a fee enhancement in the MorAmerica case in the sum of $26,259.00.