**In re APEX OIL COMPANY, et al., Debtors.**

**Bankruptcy No. 87–03804–BKC–BSS. Motion 04–13–C.**

United States Bankruptcy Court, E.D. Missouri, E.D.

Feb. 5, 1990.

Lloyd A. Palans, Michael A. Kahn, Gallop, Johnson & Neuman, St. Louis, Mo., examiner.

Bernard Shapiro, Robert Jay Moore, Howard J. Weg, Gendel, Raskoff, Shapiro & Quittner, St. Louis, Mo., Bernard Shapiro, Robert Jay Moore, Howard J. Weg, Gendel, Raskoff, Shapiro & Quittner, Los Angeles, Cal., Dennis A. Ferrazzano, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, Ill. for debtors.

Steven N. Cousins, David G. Going, John Talbot Sant, Jr., Armstrong, Teasdale, Schlafly, Davis & Dicus, St. Louis, Mo. for unsecured creditors committee.

Allen S. Boston, Lewis, Rice & Fingersh, St. Louis, Mo.

Audrey G. Fleissig, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo.

James S. Cole, Office of the U.S. Trustee, St. Louis, Mo.

## MEMORANDUM OPINION

BARRY S. SCHERMER, Bankruptcy Judge.

This cause coming to be heard upon the Application of Examiner Lloyd A. Palans for Final Compensation and Reimbursement of Expenses for the period January 27, 1988 through November 30, 1989 (the "Examiner Application"), all creditors and parties in interest having received more than twenty days written notice thereof, four objections to certain portions of the Examiner's Application having been filed, the Court having received into evidence without objection various affidavits, exhibits and designations of prior court filings and having being otherwise fully advised in the premises, the Court hereby makes the following findings of facts and separately states its conclusions of law thereon, pursuant to Rule 7052 of the Bankruptcy Rules and Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. On December 24, 1987, Apex Oil Company, Apex Holding Company, Clark Oil & Refining Corporation and 49 other subsidiaries of Apex Oil Company filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. Section 1101, *et seq.*

2. On October 11, 1988, Novelly Oil Company and Goldstein Oil Company, the partners of Apex Oil Company, filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code and have been procedurally consolidated with the Apex debtors herein. (All debtors are collectively referred to herein as "Debtors" or "Apex.")

3. On January 27, 1988, upon application of the Official Unsecured Creditors' Committee (the "Creditors' Committee"), this Court entered its Order Appointing Lloyd A. Palans Examiner. Mr. Palans has served these estates in that capacity through the present.

4. The Order appointing the Examiner allowed this Court the flexibility necessary to place the Examiner in a variety of critical situations, thereby enabling the Examiner to make a substantial contribution to the completion of this bankruptcy and facilitation of settlements and issue resolutions.

5. Given that the Examiner's present duties in this proceeding are ministerial in nature, it is appropriate to review his fees and his overall contribution to this case at this time.

### The Examiner's Application and The Four Objections Thereto

6. The Examiner and his law firm, Gallop, Johnson & Neuman, have provided 9,708.10 hours of service during the period January 27, 1988 through November 30, 1989. Legal fees incurred in the rendition of those services during that period total $1,134,042. The Examiner's firm has incurred expenses during that period of $138,095.52.

7. Pursuant to prior court orders, the Examiner and his firm have received 85% of their legal fees and 100% of their expenses. $170,106.30 of the total fees (i.e., 15%) have been held back pursuant to those court orders.

8. The Examiner's Application seeks (a) approval of 100% of the actual fees and expenses incurred, (b) an additional payment of $170,106.30 representing a bonus or upward adjustment of the lodestar in an amount equal to 15% above the actual fees, and (c) interest at an appropriate rate to compensate for loss of use of the money incurred by holdbacks.

9. Apex, P.A. Novelly, Samuel R. Goldstein and the U.S. Trustee filed objections to those portions of the Examiner's Application seeking a 15% bonus and interest on the holdback. (Messrs. Novelly and Goldstein are the principals of the Debtors and most of the non-Debtor affiliates, including non-Debtor Clark Oil Trading Company.)

10. No objections to the Examiner's request for 100% of his actual fees and expenses were filed, and no such objections were asserted at the hearing.

### Position of the Creditors' Committee

11. The Creditors' Committee supports all aspects of the Examiner's Application, including his requests for a bonus and for interest.

### Role of Examiner

12. In its Order Appointing the Examiner, this Court authorized the Examiner to take "... any necessary and appropriate actions in furtherance of assisting the Court and parties in bringing these proceedings to a just, prompt and economic disposition." Critical to the Examiner's fulfillment of this mission has been his conduct of investigations and mediations which have provided economical alternatives to potentially expensive, protracted and divisive litigation. These investigations substantially benefitted all parties by providing a disinterested participant who could assist in resolving the many conflicting and competing interests in the reorganization process.

13. The Examiner's contribution to Apex's reorganization embraced three primary areas: (1) stabilization of the estate, (2) asset disposition and (3) investigation, each of which is separately addressed below.

### Stabilization (COTC, Budget, Retention of Professionals, Establishment of Claims Resolution Procedure, etc.)

14. From the outset of these cases, the twelve bank secured lender group that had

provided credit to Apex (the "Lender Group") took a very aggressive stance with respect to the Debtors, a stance which reflected the deteriorating and increasingly bitter pre-petition relationship between these entities. According to Charles A. Hinrichs, Senior Vice President of Boatmen's Bank, a member of the Lender Group, "Acrimony and distrust were common in the day-to-day relationship between Debtors and the Lender Group." (Hinrichs Aff. at ¶ 3.)

15. The Lender Group's aggressive stance was best demonstrated by its attempt to obtain an emergency order substantively consolidating the assets of non-Debtor Clark Oil Trading Company ("COTC") with Apex. The Lender Group filed its emergency motion for substantive consolidation of COTC (the "Emergency Motion") simultaneously with the Debtors' filing 51 voluntary petitions for reorganization under Chapter 11. With the case immediately off to such a highly contentious start, this Court focused the Examiner's immediate efforts on preventing further deterioration of the debtor/creditor relationships between Apex and the Lender Group, restoring use of working capital for Apex's businesses and, most importantly, preventing costly, uncertain and bitter litigation between Apex, COTC and the Lender Group.

16. The Examiner's success in achieving these goals was attested to by Mr. Hinrichs:

> The appointment of the Examiner and his subsequent efforts in connection with numerous matters between the Lender Group and the Debtors were crucial toward stabilizing the post-petition relationship between the Debtors and the Lender Group.

(Hinrichs Aff. at ¶ 5.) This testimony is undisputed.

17. Some important goals during the early part of the stabilization process were preserving going concern values, monitoring budget and operating reports, and obtaining commitments for preparation of an asset deployment plan. The Examiner facilitated the exchange of financial and budgetary information between the parties on an ongoing basis in order to achieve these goals.

18. The record in this proceeding amply demonstrates the Examiner's achievements during the stabilization period. These achievements included: (i) facilitating permission for Apex to purchase and exchange oil futures contracts on the Mercantile Exchange and thereby permitting resumption of commodity trading activities and acquisition of sweet crude oil for Apex refineries; (ii) expediting approval of government contracts; (iii) monitoring retention of professionals; (iv) reviewing applications for compensation by professionals to determine compliance with Court guidelines; (v) preserving of utility services; (vi) preserving of executory contracts and unexpired leases (particularly related to oil tankers and certain valuable options to purchase same); and (vii) providing consolidated discovery for numerous reclamation litigants. According to Mr. Hinrichs, these "actions on the part of the Examiner gave the Lender Group great confidence in the Chapter 11 process and enabled the Debtors to have a breathing spell in which to attempt to maximize the values of their assets." (Hinrichs Aff. at ¶ 7.) Again, this testimony is undisputed.

19. While the above activities demonstrate the scope of the Examiner's day-to-day involvement in virtually every phase of this bankruptcy case, it is the Examiner's participation in, mediating and drafting of the settlement of the COTC litigation that provided perhaps the most significant contribution to the stabilization of the bankruptcy proceeding and the enhancement of the Debtors' financial situation.

20. A little background is necessary in order to appreciate the significance of the COTC settlement to this proceeding. COTC is a non-debtor Missouri partnership formed in approximately 1985. The general partnership interests in COTC are evenly divided between NIC, Inc. ("NIC") and GIC, Inc. ("GIC"), each a Missouri corporation. 100% of NIC's stock is owned by N.I.C. Holding Company ("NIC Holding"), a Missouri corporation; 100% of GIC's

stock is owned by G.I.C. Holding Company ("GIC Holding"), a Missouri corporation.

21. COTC is in the business of buying, selling, exchanging, transporting and storing petroleum and petroleum-related products, a business very similar to that conducted by Apex. COTC operated out of the Debtors offices and used the Debtors assets and employees to conduct its business.

22. In the Emergency Motion, the Lender Group alleged, among other things, that (i) Apex and COTC were or should be one in the same entities; (ii) Apex had deceived the Lender Group about the formation and ownership of COTC; (iii) Apex had known of the diversion of valuable Apex corporate opportunities to COTC; and (iv) COTC was not paying Apex fair consideration for the goods and services that it obtained from Apex.

23. Apex responded by alleging that (i) the Lender Group had full knowledge of the intricate details of the formation and business relationship between COTC and Apex; (ii) the Lender Group had promoted that relationship to enhance the value of its collateral security; (iii) all of the intercompany transactions between Apex and COTC had been undertaken primarily because of duress imposed by the Lender Group; (iv) the Emergency Motion was damaging Apex operations and its relationships with other lenders and trade creditors; and (v) the Court lacked subject matter jurisdiction over the Emergency Motion and personal jurisdiction over COTC.

24. COTC responded by raising similar objections alleging that (i) due to the Lender Group's acquiescence in and encouragement of COTC's formation, structuring, financing and operations, the Lender Group was barred from bringing the Emergency Motion; (ii) the Emergency Motion was an unlawful and unjustified interference with COTC's contractual relations with its lenders, creditors and other parties; and (iii) the Emergency Motion had specifically damaged COTC's credit relationship with Banque Paribas.

25. Full blown litigation of these conflicting claims appeared inevitable and would have been extraordinarily disruptive. In the words of Mr. Hinrichs, such litigation would have been "costly" and "bitter." It would have involved discovery from 12 different lending institutions, as well as consultants, experts and present and former employees of the Lender Group, Apex and COTC. It is likely that such litigation would have severely limited Apex's operations in Chapter 11 and resulted in efforts by the Lender Group or others to liquidate Apex.

26. Having been thrust into the role of mediator by this Court, the Examiner insisted that the Lender Group, Apex and COTC engage in negotiations in an effort to address and resolve the issues raised. It is undisputed that the Examiner's role in these negotiations was critical to their success. As Mr. Hinrichs stated, the COTC settlement was the "direct result" of the Examiner's efforts. None of the objectors challenge that statement.

27. The COTC settlement resulted in: (i) settlement of potential, protracted, time-consuming and expensive litigation; (ii) COTC's commitment to support as its foremost business priority Clark's operation of its refineries; (iii) COTC's monthly payment to Apex for the use of fixed assets, terminals, shipping services and towing services with a fixed payment by COTC to Apex for "G & A services" at the rate of $340,000 per month (increased to $410,000 per month following the AOC sale), less compensation at current levels of any traders whose employment was transferred to COTC; and (iv) monthly payment by COTC to Apex of a minimum amount of $125,000 or 35% of COTC's "net profit," whichever is greater, commencing August 1, 1988. The COTC settlement (i) enabled Apex to return to normal business operations and utilize COTC's working capital and credit for the purchase of petroleum products, and (ii) allowed COTC to hire Apex assets and facilities for fair consideration.

28. The critical importance of the COTC settlement to this bankruptcy proceeding is undisputed. As characterized in the Apex Disclosure Statement supporting the Debtors' Joint Partially Consolidating Plan of Reorganization dated December 14, 1989

(the "Disclosure Statement"), the COTC settlement:

> "... *eliminated a major dispute between the Secured Lender Group and the Original Debtors which, if not settled, might have jeopardized the prospects for a successful reorganization.* In addition to resolving a dispute that otherwise would have resulted in time-consuming and expensive litigation, *the settlement allowed the Original Debtors to share in net profits of COTC and has resulted in payments to the Original Debtors' Estates aggregating $11,-560,000 as of August 31, 1989. As discussed in Section V–A of the Disclosure Statement entitled 'General Description Of The Plan', up to 35% of the COTC Cumulative Net Profits will be available to the extent necessary after the Effective Date to help service Reorganized Apex's payment obligations under the Series B Notes.*"

(Disclosure Statement at Page 58.) (Emphasis added.)

29. While the COTC settlement eliminated a dispute which might have aborted the Debtors' reorganization efforts at the beginning, the Claims Resolution Procedure, recommended and designed by the Examiner, is also significant because it alleviated a potentially substantial drain on the Debtors' resources.

30. The Claims Resolution Procedure had its genesis when various seamen, allegedly injured onboard vessels owned or operated by the Debtors, filed motions in the Bankruptcy Court for relief from automatic stay in order to prosecute their claims in various state and federal forums. This Court designated the Examiner to investigate the effect on the Debtors of allowing these and multiple, similar claims to proceed in their respective forums outside of the Apex bankruptcy.

31. Upon completion of his investigation, the Examiner found that the Debtors' insurance coverage for these claims had deductibles ranging from $50,000 to $500,-000, that there were approximately 200 Jones Act claims pending against the Debtors throughout the country and that the average cost of defending such claims was approximately $35,000 per claim.

32. Based upon the large number of claims, the costs of defense and the large (and varying) policy deductibles, the Examiner concluded that allowing the Jones Act claims to proceed outside bankruptcy would substantially prejudice the Debtors' reorganization efforts. In light of his conclusion, the Examiner recommended a Claims Resolution Procedure which would allow many of the claims to be resolved without litigation and in one forum thereby providing considerable savings to Apex.

33. By Orders dated May 20, 1988 and August 2, 1988, the District Court and this Court established the Claims Resolution Procedure substantially in the form recommended by the Examiner. The Claims Resolution Procedure provides a simple, economical procedure for resolution of all Jones Act, worker's compensation and tort claims, and the Examiner's successful mediations of pending lawsuits under the Claims Resolution Procedure have provided significant and exceptional benefits.

34. Since the establishment of the Claims Resolution Procedure, the Examiner has mediated and achieved settlements substantially lower than claimants' original demands.[1] The mediation process established

---

1. The Examiner's mediation results to date are as follows:

| Claimant | Settlement Demand | Result | Injury |
|---|---|---|---|
| Anderson | $ 500,000.00 | $ 77,000 settlement | Disc Herniation |
| Andrews | $ 28,000.00 | $ 5,000 settlement | Fractured Ankle |
| Berger | $ 150,000.00 | $ 25,000 settlement | Back Injury |
| Breman | $ 150,000.00 | $ 4,000 settlement | Knee & Back Injury |
| Faggard | $ 500,000.00 | $ 20,000 settlement | Fractured Hand |
| Franklin | $ 80,000.00 | $ 22,500 settlement | Fractured Wrist |
| Kubicek | $1,500,000.00 | $ 75,000 settlement | Drowning |

by the Claims Resolution Procedure has thus far resolved 83% of claims submitted. The Claims Resolution Procedure, as originally recommended and subsequently administered by the Examiner, has provided direct, significant benefits to these estates through a streamlined conciliatory mediation process, far less burdensome than litigation.

### Asset Disposition

35. While the Examiner's accomplishments described above enhanced the estate by making its ongoing operations more viable, the Examiner's work with regard to "Asset Disposition" enabled the Debtors to take advantage of the sale by Apex and certain non-debtors of assets and businesses to AOC Acquisition Corporation. The AOC acquisition presented a unique and exceptional opportunity for Apex to satisfy secured claims of the Lender Group at a significant discount of approximately $150 million, preserve value for unsecured creditors and create a basis for Apex to reorganize.

36. Numerous parties objected to the proposed acquisition. The objections fell into two basic categories: (i) objectors seeking adequate protection (including miscellaneous special interest objectors) and (ii) objectors to the AOC sale on the merits. The objectors to the sale's merits, who were the bigger obstacle to the acquisition's completion, contended that: (i) the proposed "competitive" bid provisions created a "lockout"; (ii) there was inadequate disclosure of whether the sale would promote plan feasibility; (iii) the sale was actually a "sub rosa" plan; (iv) the notice of sale was inadequate; (v) there was a lack of information as to fairness of the sales price; and (vi) the equity participation of Messrs. Novelly and Goldstein's in AOC demonstrated that it was not in good faith.

37. This Court directed the Examiner to directly participate in various stages of the negotiations among AOC, Apex and the Creditors' Committee.

38. More importantly, the Examiner conducted an investigation into whether the sale would meet the good faith requirements of Section 363(m).[2] Subsequently, on October 10, 1988, the Examiner issued a sixty-page Examiner's Report on Good Faith and Fair Dealing and the Section 363 Issues Raised by the Motion for Approval of Asset Purchase Agreement Between the Debtors and AOC and the objections thereto (the "Good Faith Report"). The Good Faith Report was admitted into evidence at the hearing on the Motion for Approval of Asset Purchase Agreement.

39. In order to expedite discovery and permit a full evidentiary hearing on the proposed AOC acquisition, the Examiner scheduled and enforced consolidated discovery, which resulted in expedited document production in three cities over two days followed by fifteen depositions in three cities in less than ten days. The consolidated expedited discovery procedure enabled all parties to prepare for a full

| Claimant | Settlement Demand | Result | Injury |
|---|---|---|---|
| Langford | $ 893,366.25 | $ 15,000 settlement | Property Damage |
| Potts | $ 245,000.00 | $105,000 settlement | Fractured Leg |
| Stanfill | $ 25,000.00 | $ 3,150 settlement | Fractured Ankle |
| Babbidge | $2,566,811.50 | Elected to Proceed to District Court | |
| Haley | $1,426,831.97 | Elected to Proceed to Arbitration | |

**2.** In his investigation, the Examiner interviewed: (i) Paul A. Novelly; (ii) Samuel P. Goldstein; (iii) Peter Munk (Chief Executive Officer and controlling shareholder of The Horsham Corporation) (Note: Mr. Munk was unavailable for initial interview but furnished an affidavit in lieu of initial interview); (iv) Ian Delaney (President and Chief Executive Officer of AOC); (v) Bruce Walter (Vice President and Secretary of AOC); (vi) Samuel Zell; (vii) Robert Lurie (Messrs. Zell and Lurie were potential investors in AOC through one of their companies, MCCP, Inc.); (viii) David Schulte (investment banker with Chilmark Partners); (ix) Charles A. Hinrichs (Vice President of Centerre Bank National Association); (x) Richard Ruche (Vice President of The Chase Manhattan Bank); (xi) Marc Nicolet (Chief Financial Officer of Apex); and (xii) Rohit Phansalker (Associate Director of Bear Stearns & Co., Inc., Apex' investment banker).

evidentiary hearing and made the achievement of a timely closing, if the transaction was approved, an actual possibility.

40. On November 7, 1988, this Court authorized the sale to AOC under Sections 363(b) and 363(f) of the Bankruptcy Code. This Court directed the Examiner to monitor the preparation for the closing, attend the closing and, within ten (10) business days following the closing, file a report with this Court regarding consummation of the transactions. The closing of the AOC transactions and the sale of the Lender Group claims occurred on November 22, 1988. Mr. Hinrichs of the Lender Group testified that the timely closing of the AOC transaction was "in large measure due to the Examiner's diligence and the parties' confidence in his integrity and abilities." (Hinrichs Aff. at ¶ 10.)

41. Concurrent with Apex's efforts to sell assets to AOC (which had begun in earnest during May and June 1988), the Debtors' litigation with the United States Department of Energy (the "DOE") proceeded. The magnitude of the DOE's claim was significant by any measure: the potential exposure to the Debtors was $354,000,-000. Given the contentiousness of government counsel in the DOE proceeding, the Court appointed the Examiner to mediate discovery and other disputes. The battles with DOE included requests for injunctive relief, withdrawal of reference attempts by DOE, and estimation of DOE claims. Ultimately a settlement of claims with DOE resulted in a discount of DOE claims for a cash payment of $15,000,000.

42. The disposition of assets to AOC, the settlement and release of Lender Group claims and disposition of DOE claims at discount yielded rare and exceptional results. The Examiner provided invaluable assistance to the Debtors in achieving these outcomes.

### Investigation of Available Claims and Causes of Action

43. With the Lender Group out of the case and the opportunity for a consensual plan created by the AOC acquisition, the Examiner was next ordered to undertake the more traditional role of investigating the Debtors' affairs.

44. Numerous factors made the Examiner's investigation a substantial undertaking. First and foremost was the magnitude and complexity of (i) the Debtors' affairs, (ii) the transactions among the Debtors and with their non-debtor affiliates, and (iii) the Debtors' relationships with principals and third parties. The Debtors' activities with non-debtor affiliates increased the magnitude of the investigation as illustrated by the fact that one such non-debtor entity engaged in close to $1 billion in oil trading transactions with the Debtors during the 1980's. Another factor aggravating the Examiner's problems was the initial delay in obtaining information from the principals and non-debtor affiliates caused by (i) the filing of a motion to disqualify the Examiner (eventually withdrawn after a flurry of discovery); and (ii) the filing of scores of motions to quash various subpoenas and motions for 2004 examinations. Moreover, the inability to locate certain witnesses and the location of witnesses in foreign countries further contributed to the difficulty.

45. Even without these various procedural and logistical obstacles, the Examiner's task in conducting the investigation was onerous. The major portion of the investigation was conducted on an expedited basis over approximately three months. During this time, the Examiner interviewed over 50 witnesses, including present and former Apex personnel, professionals and employees of third parties that represented or did business with, against or for Apex over the years. In spite of initial opposition, hundreds of thousands of pages of documents were eventually produced and reviewed. Near the close of the investigation the Examiner took sixteen examinations within seven working days under Rule 2004. One witness was re-examined over an additional two days. All information was cataloged and categorized to facilitate retrieval.

46. On June 14, 1989, Examiner filed a 249–page Statement of Investigation of Causes of Action available to the Estates

(the "Examiner's Report") and a two-volume Appendix of exhibits, charts and other documents. The Examiner's Report concluded that the Debtors had several possibly meritorious and substantial claims against certain non-debtor affiliates, including the principals of the Debtors. However, the Examiner also determined that protracted litigation did not appear to be in the best interests of the Debtors and their creditors. Accordingly, the Examiner's Report concluded with a strong mandate to settle these potential claims.

47. The non-debtor affiliates and Messrs. Novelly and Goldstein contested all material findings in the Examiner's Report, and there has been no judicial determination of the accuracy of the Examiner's Report or the responses thereto. Nevertheless, it is clear that the Report had a substantial impact on the funds available to creditors under a consensual plan: shortly after filing of the Examiner's Report, there was a significant increase in the offer to creditors of these estates from the Debtors.

48. Prior to the filing of the Examiner's Report, the then-proposed plan of reorganization provided for a $40 million distribution to unsecured creditors. According to testimony of Robert H. Brownlee, an attorney for Chemical Bank (as Indenture Trustee) who participated in a new round of plan negotiations after the filing of the Examiner's Report, the Report "was a catalyst for continuing negotiations on behalf of creditors' representatives with representatives of Debtors and a material contributing factor to negotiation of economic proposals set forth on behalf of Debtors and certain non-debtor affiliates as embodied in the existing Joint Partially Consolidating Plan of Reorganization proposed by Debtors." (Brownlee Aff. ¶ 2.) Mr. Brownlee's testimony is undisputed.

49. Under this new proposed plan of reorganization, the distribution to unsecured creditors increased by $13 million to $53 million.

*Other Findings*

50. The record in this case is replete with examples of litigious postures taken by various parties, as illustrated by: (1) the bitter relationship between the Lender Group and the Debtors over COTC and numerous other matters at the outset of the case, (2) the aggressive litigation posture of the DOE, (3) the multi-city discovery in connection with the AOC acquisition, and (4) the numerous and vigorous attacks on the Examiner in an attempt to hamstring the final investigation (including motions to quash, a motion to disqualify the Examiner, and motions regarding confidentiality of the Report).

51. Again and again, the Examiner overcame this litigious and volatile climate to achieve expeditious and beneficial resolutions for these Debtors and their creditors. Indeed, many of the above disputes, if allowed to proceed to full scale litigation, would likely have derailed the reorganization proceeding. Instead, the Debtors received the rare and exceptional benefit of expeditious resolutions which enhanced or preserved the value of the estate.

52. Based on the foregoing findings, the other evidence presented at the hearing, and this Court's observations of the Examiner's performance throughout the term of his appointment, this Court finds that the Examiner has shown truly uncommon and exceptional skill in this case and has played a key and pivotal role in each of the significant matters this Court has assigned him.

### CONCLUSIONS OF LAW

1. In reviewing a final application for reimbursement for professional services, the initial inquiry is the determination of the basic "lodestar" amount, which is calculated by multiplying a reasonable hourly rate by the number of hours actually and reasonably expended. *In re Morris Plan Co. of Iowa*, 100 B.R. 451 (Bankr.N.D.Iowa 1989). No party has objected to the quality of the Examiner's services, to his entitlement to full compensation for those services, or to the reasonableness of the hourly rates for these services. Nor has any party objected to the expenses incurred by the Examiner and his firm.

Having conducted its own review of the lodestar amount and the expenses incurred, this Court concludes that the Examiner is entitled to 100% of his actual fees and expenses.

■ 2. The Examiner has also requested a bonus or lodestar enhancement equal to 15% of the actual fees. While the Supreme Court has limited the availability of performance-based fee enhancements in non-bankruptcy settings,[3] bankruptcy courts have held that those opinions, because they are based on fee-shifting statutes, are not "strictly" determinative in the bankruptcy context. *In re Morris Plan Co. of Iowa*, 100 B.R. 451, 457 (Bankr.N.D.Iowa 1989) (citing *In re Manoa Finance Co., Inc.*, 853 F.2d 687, 689–91 (9th Cir.1988); *In re Baldwin–United Corp.*, 79 B.R. 321, 344–46 (Bankr.S.D.Ohio 1987). The parties agree that the appropriate test for an award of a bonus or lodestar enhancement is whether the applicant's services have been "rare and exceptional."[4]

3. As previously detailed in the Findings of Fact, the Examiner played a key and pivotal role in every significant phase of this bankruptcy proceeding. His work on the COTC settlement enabled the Debtors to eliminate perhaps the greatest obstacle to the success of this bankruptcy, the prospect of total war with the Lender Group. In the process, the resulting settlement significantly enhanced the value of the Debtors' estates. Regardless of the eventual resolution of these proceedings, the COTC settlement alone has enhanced these estates by at least $11.5 Million in actual dollars. The Claims Resolution procedure, a process created and administered by the Examiner, has already resulted in the elimination of millions of dollars in contingent claims thereby making the plan process easier since the Debtors could get a more accurate determination of their liabilities. Lastly, the substantial enhancement by millions of dollars in the value of the proposed consensual plan, subsequent to the filing of the Examiner's Report on possible claims available to the Debtors, speaks volumes about the significance of the Examiner's role in this bankruptcy proceeding.

4. These results, combined with the other facts described above and the Court's observations of the Examiner's performance and impact on these cases throughout these proceedings, demonstrate that this case could not have arrived at its current posture without the Examiner's persistent and exceptional involvement and dedication to moving it forward. The evidence demonstrating the Examiner's role in both enhancing the value of these estates and saving the Debtors millions in legal fees by successfully mediating otherwise destructive disputes more than adequately justify the Examiner's requested fifteen percent bonus. His performance and achievements have been rare and exceptional. *In re Morris Plan Co. of Iowa*, 100 B.R. 451 (Bankr.N.D.Iowa 1989) (fee enhancement allowed based upon outstanding work); *Matter of Baldwin–United Corp.*, 79 B.R. 321 (Bankr.S.D.Ohio 1987) (bonus awarded of 10% to 15% to various counsel based upon their outstanding work and results obtained).

■ 5. The Examiner also asks for interest for the fees held back pursuant to the Court's various orders on interim compensation. The Court denies this request. Although it is true that there has been a 15% holdback of fees, the Court's order requiring monthly payment of 75% of the total fees (and 100% of monthly expenses) plus interim orders allowing an additional 10% have more than compensated for the delay in receiving the remaining 15%.

---

3. *See e.g. Pennsylvania v. Delaware Valley Citizens Council for Clean Air (Delaware Valley I)*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

4. The Examiner has also presented evidence that his firm's average rates are substantially below the rates of the two Los Angeles law firms and the Chicago law firm representing the Debtors. The Examiner has urged the Court to adopt a "national" lodestar approach to the fee enhancement as a separate and independent approach to a bonus. The Court declines to decide this issue on a "national" lodestar approach.

A separate order consistent with this opinion has already been entered on January 26, 1990.